■ In the Matter of the Estate of CONRAD EMBERGER, Deceased. HELEN EKLUND et al., Appellants-Respondents; EDWARD A. BRODERICK, as Administrator of the Estate of ELIZABETH R. EMBERGER, Deceased, Respondent-Appellant.— Decree of the Surrogate's Court, Queens County, made November 20, 1967, affirmed insofar as appealed from by the respective parties, without costs. No opinion. Christ, Acting P. J., Brennan, Rabin and Martuscello, JJ., concur; Munder, J., dissents in part, as indicated in the following memorandum, and otherwise concurs. On March 7, 1940, when the testator was 68 years old and his wife, Elizabeth, 60, he made provision by way of an Equitable Life Assurance Society annuity contract for the monthly payment of $100 to them jointly or to the survivor. They were then living in a one-family dwelling in Queens Village, owned by them as tenants by the entirety. Living with them was the testator's sister, Emma, who at his request had given up her own home to do so. It seems

652

that, although there was never a judicial determination as to the incompetency of his wife, since 1925 or 1926 she required supervision because of her bizarre behavior; and she was described as " an alleged incompetent " in the petition to probate the testator's will and in an accounting proceeding by the executrices of the testator's estate. On April 18, 1940, six weeks after purchasing the annuity, the testator executed his will. In article " Third " thereof he provided that the residue of his estate, approximating some $28,000, was bequeathed to his sister, Emma, and Helen Eklund, his niece, as trustees, to invest the principal and, after deducting all necessary expenses of the real estate, " to pay over the net income thereof for the support and maintenance of my beloved wife, Elizabeth Rosemary, as long as she lives and also in the event that during her life the said net income shall not be sufficient, then I empower and I direct that my said Trustees herein named shall use so much of the principal of said trust therein provided for her as they, in their discretion shall deem advisable to the support and maintenance of my said wife, Elizabeth Rosemary, as long as she lives." The balance of the trust fund remaining upon the wife's death was bequeathed to the testator's sister Emma, or, if she then were deceased, to the testator's brothers and sisters then living, in equal shares. Under article " Fourth " Emma's living expenses, while she resided with the testator's widow, were also to be paid out of the net income. On October 4, 1946, the testator died. His will was probated and the trust was established. Emma died on January 3, 1961 and the widow died on April 18, 1961. Emma and the widow had maintained a joint bank account to facilitate the handling of the annuity checks. That income, totalling during the trust period $18,220.90, together with the trust income, totalling $25,352.06, and trust principal in the amount of $1,915.13, for a grand total of $45,488.09, or about $3,000 a year, was used for the support and maintenance of the widow and, to some extent, the sister. The surviving trustee and the representatives of the deceased trustee brought this proceeding for judicial settlement of their account. Objections were filed by the administrator of the estate of the widow. Among those objections was one in which it was alleged that the deceased widow had been incompetent to manage her own affairs and that, with the knowledge that she was receiving an annuity of $100 per month, the trustees improperly used said annuity funds for the support and maintenance of the beneficiary and the co-trustee Emma Emberger, instead of invading the principal of the trust therefor. The learned Surrogate concluded that the trustees should have used principal of the trust for support of the testator's widow, to the extent trust income was insufficient, " irrespective of the personal assets or income of the life beneficiary." He surcharged the trustees $32,143.39, or about $1,500 less than the present trust fund balance. He denied objections that sought the imposition of a surcharge for net gains on investments [about $7,000] and did not grant an application by the objectant for costs. The Surrogate's conclusion is based upon an equation of the language of the instant will with that construed in *Holden* v. *Strong* (116 N. Y. 471); *Rezzemini* v. *Brooks* (236 N. Y. 184); and *Matter of Clark* (280 N. Y. 155), in each of which a similar trust provision was held to require or permit the invasion of the principal to provide support for the beneficiary without regard to other income of the beneficiary. It is from this part of the decree that the trustees now appeal. The primary question, of course, is whether or not the testator intended to make an absolute gift of support and maintenance which was to be charged against the principal of the trust fund as well as the income. In *Holden v. Strong* (*supra*, p. 473), the testator gave the trustee " full power and authority to use so much of the trust fund, either interest or principal, as shall, in his judgment and discretion, be necessary for the proper care, comfort

and maintenance" of the beneficiary, his son. The court held this language to mean that the beneficiary was entitled to full support from the fund, irrespective of his earning capacity. The proceeding was one instituted by the beneficiary, and not one where the interests of remaindermen were alleged to be put in jeopardy by an invasion of the trust. In *Rezzemini* v. *Brooks* (*supra*, p. 191–192), the gift was of the income of a trust, with the further provision that "'If the income from my estate shall be insufficient for the proper support of my said son, then in that event, I authorize and empower my said trustee to expend so much of the principal thereof as may be necessary for that purpose.'" Upon the death of her son the testatrix bequeathed the principal of the trust, "or so much thereof as may then remain" (p. 191), to the infant remainderman. Though the court held that the gift was one of care and support from income and principal of the fund irrespective of the beneficiary's independent means, the court said that in the absence of the last quoted words the remaindermen would have succeeded to the principal of the trust upon the death of the beneficiary. In *Matter of Clark* (*supra*, p. 158–159), the testator *inter alia* provided: "'In the event that the income provided for my said wife under paragraph "Fourth" above shall, in the judgment of my trustee, be insufficient for her every comfort and support, I authorize my said trustee to pay to her, in addition to income, such portion of the principal of the said trust as it shall from time to time deem necessary'". From this language it was there held to be the clear intent of the testator that the trustee was required to furnish every comfort and support for his widow deemed necessary "out of income and, if required, out of the corpus, even to the extent of exhausting the entire corpus of the trust, without taking into consideration or account the personal income of the beneficiary from any other source" (p. 161). Relying strictly on the language of article "Third" of the testator's will the Surrogate may be justified in reaching the conclusion he did. However, it is inconceivable to me that the testator intended that the corpus of the trust was to be exhausted in order to support his widow while the income from the annuity which he had apparently created for that very purpose was to be preserved for the benefit of his widow's heirs. Our Court of Appeals has said that if the testator's intention is not clear then it "must be gleaned not from a single word or phrase but from a sympathetic reading of the will as an entirety and in view of all the facts and circumstances under which the provisions of the will were framed" (*Matter of Fabbri*, 2 N Y 2d 236, 240). Reading the will in its "entirety", it will be noted that the testator appointed his sister, Emma, and his niece as co-executrices and trustees, granting them sole discretion to carry out the provisions of his will; and that in the last sentence of article "Third" of the will he specifically bequeathed the unexpended balance of the trust fund "and any accumulations thereof" to his sister, Emma, or equally to his surviving brothers and sisters should she then be deceased. This, together with the fact that he charged his sister with the care of his wife, would indicate an intent, within the four corners of the instrument, that the principal of the trust fund be not expended for his widow's support unless absolutely necessary and that his sister, Emma, or the heirs of his own blood be provided for thereby. The will discloses no concern for the distributees of the testator's wife. Looking to the circumstances under which the provisions of the will were framed I am forced to the same conclusion. The principal of the trust fund constituted the bulk of the testator's estate, approximately $28,000. He had in addition some $2,900 in joint assets in a bank account and United States saving bonds, the real estate owned with his wife as tenants by the entirety, and the annuity contract. If this principal had been invaded at the rate of the $1,200 yearly income realized from the annuity, it

would have been exhausted before the death of his widow.* Moreover, we have the purchase of the annuity contract itself just six weeks prior to the execution of the will. This to me is indicative of an intent on the part of a conservative and solicitous husband to provide a steady flow of income to his wife to supplement what she might inherit from his estate. I think he would have been shocked if told that his will would be construed to provide for the exhaustion of his savings so that the monthly annuity payments could be accumulated for the benefit of his wife's distributees. To me it is evident that the testator must have intended that the principal of the trust be preserved in order to insure an adequate income for his beneficiary. Any regular invasion of the principal would have progressively reduced the income available to her. In *Matter of Martin* (269 N. Y. 305, 308), the testator left the residue of his estate in trust to his cousin, "'the net income thereof, in quarter-yearly installments, and such part of the principal thereof as she may require for her care, support and comfort, during her natural life.'" The beneficiary had an income separate and apart from the trust fund. The court there reached the conclusion that she was entitled to have supplied for her care and support "a portion of the principal of the trust fund only in the event that the income from the trust fund supplemented by her independent income shall be insufficient to provide for her proper care, support and comfort" (p. 312). I believe the language of the instant will — "I direct that my * * * Trustees * * * shall use so much of the principal of said trust * * * as they, in their discretion shall deem advisable to the support and maintenance of my said wife" — is equally susceptible to the same interpretation. The surrounding circumstances under which this will was drawn, including the fact that the annuity income was from funds provided by the testator himself and not from the widow's independent means, make the conclusion that invasion of the principal was to be dependent upon the actual needs or requirements of the beneficiary even more compelling. In addition, we have the basic rule that heirs of the blood should be preferred to strangers (*Matter of Englis*, 2 N Y 2d 395; *Matter of Larkin*, 9 N Y 2d 88). For the reasons herein expressed I would modify the decree so as to (1) strike out the decretal provisions which sustain objections 3, 5 and 7 to the final account of the trustees, surcharge them, approve the claim of respondent-appellant in the amount of $32,143.39, and direct the trustees to pay out said amount as a surcharge and (2) overrule said objections.

---

*Assuming a constant income of 6% per annum on the principal and a yearly expense of $3,000, only $274.52 would have remained in the principal account at the end of 14 years. The widow died 14½ years after her husband. The computation was made on an annual basis and assumed that one could find an investment that paid 6% while allowing reduction of principal as needed.